T.J. EBERHARDT, Plaintiff–Appellee,

v.

James L. WATERS,
Defendant–Appellant,

Lynda B. Waters, Dunwoody Medical
Services, Inc., Defendants.

No. 89–8601.

United States Court of Appeals,
Eleventh Circuit.

May 23, 1990.

John G. Haubenreich, John Archer Thompson, Jr., Greenfield Bost & Pendergast, for defendant-appellant.

Peyton S. Hawes, Jr., Robert Michael Dyer, Atlanta, Ga., for plaintiff-appellee.

Before HATCHETT and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this appeal, we affirm the district court's grant of summary judgment holding that an arrangement involving the sale of cattle embryos constituted the sale of a security under Georgia law.

## FACTS

Dr. T.J. Eberhardt, the appellee, invested in an investment program with International Cattle Embryo, Inc. ("ICE") a business entity engaged in producing and selling Santa Gertrudis cattle embryos. ICE provided a variety of services to purchasers, including the storing of the embryos in liquid nitrogen freezers, the transferring of embryos to recipient cows, the caring for any resulting calves, the registering of those calves, and the maintenance of all records.

ICE's operation involved the process of artificially inseminating superovulated "donor cows" for reproduction. Following insemination, if a pregnancy resulted, the embryos were flushed from the cows and stored in freezers cooled by liquid nitrogen. An investor, such as Eberhardt, could invest in the operation by purchasing embryos. Thereafter, the investors had the option of having the embryos implanted in recipient cows which ICE owned or leased, or of having the embryos transferred to an alternative ranch for implantation.

If a female calf were born from one of the embryos, ICE would care for it to maturity. Thereupon, the investor could use the cow as a donor, thereby giving the investor the ability to produce embryos rather than purchase them. In theory, the investor could use all female calves as potential donors. Because a male calf did not represent the same profit-making capability, the investor bore the risk that the calf would be born male.

Investors also had the option of trading purchased embryos for a heifer in order to obtain a donor without having to wait for a full-term pregnancy and the corresponding maturation period of their calves. By trading for the mature cow, investors could begin producing embryos at a much earlier time. An investor who purchased embryos from ICE had the option to engage ICE's management services, or to contract with another provider to have those services performed. The plan was attractive because an investor could obtain calves of a valuable breed without owning any cattle of the valuable breed.

Sometime in late 1985, ICE's directors, James L. Waters, William Earle Strother, and Hubert Peterson called upon Eberhardt and offered to sell him an interest in ICE's cattle embryo operation. Eberhardt, who had no experience with cattle, agreed to pay $100,000 to ICE for 40 Santa Gertrudis embryos. Later, he traded four embryos for a mature cow which bore one calf. Before Eberhardt had established a herd of Santa Gertrudis cattle to sell for profit, ICE encountered financial problems. Eberhardt attempted to transfer the cattle and embryos to another ranch, but the transfer never took place because the important records needed for the success of the project were either not kept as promised, or not transferred properly.

## PROCEDURAL HISTORY

Eberhardt brought this lawsuit against ICE, Waters, Strother and Peterson seeking to recover the initial $100,000 investment, punitive damages, and other monetary damages. In Count IV of the complaint, Eberhardt alleged that the investment program was not registered with the Secretary of State of Georgia although it constituted the sale of a security under the Georgia Securities Act. He sought to rescind the agreement based on ICE's failure to register the security with the Georgia Secretary of State's Office as required by O.C.G.A. § 10–5–5.

Following Eberhardt's voluntary dismissal of Peterson, the district court entered default judgments against ICE and Strother. Additionally, the district court granted summary judgment in favor of Eberhardt and against Waters on Count IV concluding that the sale of embryos constituted the sale of a security under the Georgia Securities Act.

## CONTENTIONS

Waters appeals the district court's grant of summary judgment contending that unresolved factual disputes remain. Eberhardt, on the other hand, contends that no genuine issues of material fact exist, and he is entitled to judgment as a matter of law because the transaction constituted the sale of a security under Georgia law.

## ISSUE

The sole issue in this appeal is whether Eberhardt is entitled to summary judgment.

## DISCUSSION

An order granting summary judgment is not discretionary. This court must make a *de novo* and independent review of the district court's decision to grant summary judgment. *Tackitt v. Prudential Insurance Co. of America*, 758 F.2d 1572, 1574 (11th Cir.1985). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-

vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party moving for summary judgment "has the burden of showing that there is no genuine issue of fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "[A] party opposing a properly submitted motion for summary judgment may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. All evidence and reasonable factual inferences therefrom must be viewed against the party seeking summary judgment. *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1176 (11th Cir.1985).

The test for determining whether an investment is a security is the same under both the Georgia Securities Act and the federal securities laws. *Plunkett v. Francisco*, 430 F.Supp. 235, 238 (N.D.Ga. 1977). The parties agree that the proper test to be applied in this case is provided in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In *Howey* the Supreme Court established the three elements of an investment contract: (1) an investment of money, (2) in a common enterprise, and (3) an expectation of profit solely from the efforts of others. *See Howey*, 328 U.S. at 299, 66 S.Ct. at 1103.

In this case, the parties agree that Eberhardt's purchase of cattle embryos for $100,000 satisfies the first prong of the test. They disagree, however, as to whether the second and third prongs have been satisfied.

### A. Common Enterprise

A common enterprise exists where the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Villeneuve v. Advanced Business Concepts Corp.*, 698 F.2d 1121, 1124 (11th Cir.1983). The thrust of the common enterprise test is

that the investors have no desire to perform the chores necessary for a return, and are attracted to the investment solely by the prospects of a return. *S.E.C. v. Koscot,* 497 F.2d 473, 478 (5th Cir.1974). "[T]he fact that an investor's return is independent of that of other investors in the scheme is not decisive." *Koscot,* 497 F.2d at 479.

■ In opposing the motion for summary judgment, Waters relies on his affidavit and a promotional sales brochure which ICE gave to prospective investors. Waters argues that the plain language of the brochure indicates that ICE offered two distinct services—an embryo transfer service either at the breeder's facility or at ICE's clinic and an optional management program. Waters maintains that this transaction fails to satisfy the "common enterprise" prong because each investor's success is determined by how well the investor exercises the option of whether or not to utilize ICE's management services. Waters further argues that because ICE made no guarantee that each embryo would produce a viable pregnancy or result in an aborted pregnancy, each embryo had its own value totally independent of other embryos. Accordingly, Waters concludes that the financial success of each investor was independent from that of other investors based on the viability and success of individual embryos.

Waters contends that the amount of control exercised by investors is in dispute, and a trial is necessary to resolve this disputed issue. We disagree. Waters's affidavit does not contradict any of the material evidence necessary to resolve this case. As did the district court, in determining this summary judgment issue, we rely on undisputed facts. We note that Eberhardt had no experience with cattle. Furthermore, we note that significant technical expertise is required if an investor intends to take possession and successfully maintain the embryos at a facility other than at ICE. Thus, it is unlikely that an average investor would be in a position to assume or maintain any substantial degree of control over the investment. Consequently, we can only conclude that Eberhardt had no desire to perform the chores necessary for a return, and was attracted to the investment solely by the prospects of a return. Additionally, we find the facts in this case similar to *Plunkett v. Francisco,* 430 F.Supp. 235 (N.D.Ga.1977) which held that the common enterprise prong was satisfied in a situation involving the leasing of cows and a separate maintenance and marketing agreement. In *Plunkett,* the defendants also argued that the arrangement was not an investment contract because the investor had the ability to assume actual control of the calves. Despite this argument, the *Plunkett* court concluded that the arrangement was a security and granted summary judgment. The court reasoned that the maintenance agreement contemplated complete reliance on the "herdowner" and held that "the commonality element is present as long as the fortunes of all of the investors are tied to the expertise and efforts of the promoter" despite the fact the investors bore the risk that cows would abort and the calves would die. *Plunkett,* 430 F.Supp. at 239.

The only factual difference between *Plunkett* and ICE's operation is that in this case, the investors purchased cow embryos, while in *Plunkett* the investors leased cattle. We place little significance in this difference, and thus hold that the common enterprise prong is satisfied.

### B. Solely from the efforts of others

■ Waters argues that the success of the investment was not dependent on ICE, but rather on how well the investor exercised the option of either having ICE or another facility perform the maintenance services. As indicated above, however, the average investor needed to rely on Waters and ICE in order for the venture to be a success. Furthermore, because of the technical nature of the embryo operation and Eberhardt's inexperience, any control granted to the investors in ICE's brochures was illusory and insufficient to disqualify the investment as a security. *See Albanese v. Florida Nat. Bank of Orlando,* 823 F.2d 408, 412 (11th Cir.1987) ("solely from the efforts of others" prong of the *Howey* test satisfied given the insubstantial, illusory control of investors and the lack of reasonable alternatives to reliance on the

investor); *see also Plunkett,* 430 F.Supp. at 239 (an investor not knowledgeable about cows was dependent on the expertise of the promoter despite an agreement permitting an investor to assume control). Because ICE performed all of the tasks necessary for the success of this operation, and Eberhardt needed to rely on ICE to perform these tasks, the requirement that the investor expect profits solely from the efforts of others is satisfied.

## CONCLUSION

We conclude that no genuine issues of material fact remain, and based on the evidence, the arrangement involved in this case constitutes the sale of a security. Accordingly, we affirm the district court.

AFFIRMED.