[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-15378
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 17, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 06-22197-CV-MGC

LEONIDAS DOWLEN,

Plaintiff-Appellant,

versus

SECRETARY OF VETERANS AFFAIRS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 17, 2008)

Before BIRCH, MARCUS and PRYOR, Circuit Judges.

PER CURIAM:

Leonidas Dowlen, a 63 year-old physician, appeals from the district court's decision granting his former employer, the Department of Veteran's Affairs ("VA"), summary judgment in his employment discrimination suit brought pursuant to the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 623(a)(1). Because Dowlen failed to present evidence to create a genuine issue of material fact that the VA's proffered work performance related reasons for his termination were pretextual, the VA was entitled to summary judgment on his claim. Accordingly, we AFFIRM.

## I. BACKGROUND

Dowlen filed the instant complaint against his former employer, the VA. He alleged that he was a medical doctor who was given an appointment as a physician on 8 August 2004, at the Miami Veterans Administration Hospital ("hospital") and his contract was to be extended on 15 August 2006. He contends that his employment was terminated on 28 July 2006 because he "was too fixed in his way[s]," and he "spent too much time with his patients," in violation of the ADEA. R1-1 at ¶ 11. He sought reinstatement and damages.

Thereafter, the VA answered his complaint and denied his claims. Following a discovery period, the VA submitted its motion for summary judgment. In its motion, the VA claimed that Dowlen could not prove a prima facie case of

2

age discrimination, in that the same person who hired Dowlen was responsible for his termination, and that the reasons for terminating him were legitimate and nondiscriminatory. The VA claimed the following reasons for terminating Dowlen: (1) his performance at the urology clinic was deficient, in that he could not see the requested number of patients; (2) he was unable to perform the required number of cystoscopies, and when he conducted cystoscopies, he did so utilizing questionable practices; (3) he created problems at the hospital lab; (4) he was unwilling to perform surgical procedures; (5) he had a poor working relationship with the residents; and (6) nurses assigned to work with him complained about his performance. The decision to terminate Dowlen was made by the Chief of Staff, Dr. John Vara, the same individual who hired him.

In support of its motion, the VA submitted depositions of the following individuals: (1) Dowlen; (2) Dr. Seth Spector, Chief of Surgery; (3) Dr. Bruce Kava, Chief of Urology; (4) Lisa Silbert, nurse practitioner for urology; (5) Jodi Rhoda, surgical coordinator for the urology department; (6) Dr. Adrienne Carmack, urology resident; (7) Dr. Brian Cohen, urology resident; (8) Hector Delgado, operating room surgical nurse; and (9) Conception Gutierrez-Gonzalez, medical technologist. The VA also submitted a letter dated 6 April 2006 to Dr. Valenzuela regarding complaints about Dr. Dowlen's laboratory use, and the

transcripts of the Equal Employment Opportunity Commission's ("EEOC") examination of Dr. Spector and Dr. Vara.

Dr. Vara, who was 52 at the time of Dowlen's termination, testified that Dowlen was hired by the VA in 2004 to be a temporary full-time physician, primarily focusing on the clinic with the expectation that he would see somewhere between 20 to 25 patients a day. Dowlen was 61 at the time he was hired. Dr. Vara stated that, following a period of concerns dating back to 2005, because Dowlen was having a great deal of difficulty seeing sufficient numbers of patients, among other things, the Medical Center made the decision not to convert his position to a permanent status. Dr. Vara further stated that as Dowlen was coming toward the end of his first year, Dr. Vara had been briefed by the surgery service that Dowlen was seeing approximately six to eight patients per day, and that there were ongoing issues with him leaving adequate notes. In addition, although Dowlen and a physician's assistant both worked in the clinic, the clinic was seeing an average of only 8 to 12 patients per day, "far less than what one would expect." Accordion Folder, Dkt. No. 44, Exh. L at 7. "The original expectation was Dr. Dowlen himself would see 20 to 25 patients per day, and then adding a physician assistant or a nurse practitioner, that we would be able to see somewhere between 40 to 50 patients per day, and this wasn't occurring." Id.

4

Dr. Vara stated that although Dr. Spector met with Dowlen regarding these issues in late summer or early fall 2005, "Dr. Dowlen continued to have difficulty leaving adequate notes in the record, being able to see more than 8 to 10 patients per day, and that would be with the physician assistant there." Id. at 8. Therefore, because he was not meeting their performance expectations, the decision was made not to convert his position to a permanent status. Dowlen was 63 at the time of his termination.

Dr. Spector, who was 35 years old at the time of Dowlen's termination, testified that he, as chief of surgery, was responsible for the urology department, as that department is a part of surgical services. He entered that position in the last few days of November 2005. Although Dr. Spector contributed to the termination of Dowlen's employment, he did not have the sole decision-making authority to do so, rather, the final authority rested with Dr. Vara. Dr. Spector made the recommendation to Dr. Vara, who agreed after an ongoing discussion regarding the matter.

Dr. Spector testified that he had approximately four meetings with Dowlen regarding his performance. In the first meeting, Dr. Spector told him not enough patients were being seen, that the clinic needed to see 20 patients a day, minimum, which was not an unreasonable number to see in a day. Dr. Spector also discussed

5

with Dowlen the need to do things more quickly, and although he suggested that dictating notes would speed things up, as well as other efforts, Dowlen was unwilling to undertake those measures. Dr. Spector informed Dowlen that a physician's assistant, Darly Benosh, was seeing more patients than she should have been seeing, that she had other responsibilities, and that he was to see the majority of the patients. Dowlen told him he would try, but he did not think he could see more patients.

Dr. Spector also stated that he discussed with Dowlen at length his reasons for wanting so many urine tests, why they needed to be done, and how his practices were inefficient. Dr. Spector testified that Dowlen "needed to go down and call about every urine that went down to the lab. He needed to go down to the lab. He would leave the clinic and bring things down to the lab. These are inefficiencies in a person that we [] hired to be a urologist and to see patients." Id., Exh. B at 46. According to Dr. Spector, Dowlen practiced "defensive medicine," meaning that he ordered more tests than necessary and saw patients more often than necessary. Id. at 90-91. He reported that Dowlen "told [him] this directly, he didn't want to be sued." Id. at 91.

With regard to Dowlen's labwork practices, Dr. Spector stated that Dowlen often ordered his lab tests as "stat," meaning that the tests were to be completed

within an hour.  Id. at 100.  The tests he ordered were not medically necessary as stat orders, and they made the backlog in the lab longer.  Id.  Concerning Dowlen's surgeries, although Dowlen originally performed surgeries and supervised residents performing urological surgery at the beginning of his employment with the VA, a few months into his probationary period, Dowlen informed him that he did not want to perform surgeries or endure the stress of surgery.  Id. at 90.

Dr. Spector admitted that although he did not specifically remember saying it, he may have told Dowlen that he was "too fixed in his ways."  Id. at 92-93.  Further, he may have discussed Dowlen's reluctance to adapt to certain processes or procedures with Dr. Kava and Dr. Vara.  Id. at 93.  Dowlen's temporary replacement was Dr. Tony Lawongo, who is in his thirties.  His permanent replacement is Dr. Victoria Bird, who is also in her thirties.  Both are approximately 30 years younger than Dowlen.

In his opposition to the VA's motion for summary judgment, Dowlen maintained that he had established a prima facie case of age discrimination, and that the proffered reasons for his termination were pretextual.  He argued that: (1) the low number of patients seen at the urology clinic was a result of long-standing scheduling problems, over which he had no control; (2) Dr. Vara was the "cat's paw" in both hiring and firing him, had no direct knowledge of his performance,

7

and had done no investigation into his termination, R1-46 at 4-5; (3) his quality of patient care was high, he had complained about the standard of care at the hospital, and would see the patients scheduled for appointments and cancel those whose health was not appropriate for their scheduled procedures; (4) he received no formal performance evaluation and minimal informal evaluation, was never informed of an expected daily patient quota, and even when he was told he needed to see more patients, the ability to do so was largely controlled by non-physician scheduling and therefore, outside of his control, and regardless, he did see the number of patients he was supposed to see; and (5) many of the complaints Dr. Spector asserted as reasons for terminating him did not reach Dr. Spector before the decision was made to terminate him.

In support of his opposition to summary judgment, Dowlen submitted the depositions of himself, Dr. John Vara, Danny Toledo, registered nurse for the outpatient clinic and Dr. A.J. Furst, senior consultant to the Chief of Staff. He further submitted a termination letter dated 12 July 2006; a Primary Care/Urology Service Agreement; and, a letter to Dr. Spector from himself regarding his termination.

The district court entered an order granting summary judgment in favor of the VA. The court ruled that Dowlen had established a prima facie case of age

8

discrimination, but had failed to establish that the VA's legitimate, nondiscriminatory reasons for his termination were pretextual. Specifically, the court found that most of the testimony proffered by the hospital was consistent with that of Dowlen, and the small inconsistencies, such as the date Dowlen stated he met with Dr. Spector regarding his low productivity and inadequate notes, were inconsequential to the case. Rather, the court found that the "overwhelming majority of the evidence" indicated that most of the people who worked with Dowlen believed his performance to be poor, and many of Dowlen's admissions indicate that the VA's proffered reasons for termination were legitimate. R1-61 at 20. For example, the VA stated that one reason for termination was the low numbers of patients seen by Dowlen on a daily basis; Dowlen admitted that he cancelled patients' appointments, but stated that it was for the patient's own health. However, Dowlen stated that only about five patients per day met this criteria for being seen during their scheduled appointments. Further, as one of the reasons Dowlen was hired was to reduce the backlog of patients and to increase the numbers of patients seen, evidence that his practices were not conducive to reducing this backlog, and therefore were incompatible with that goal, was sufficient for the VA to credibly criticize his methodology as inadequate and use it

as a basis for his termination. As such, their stated reasons for his termination were not pretextual.

Further, the district court found that there was insufficient evidence to support Dowlen's "cat's paw theory" that Dr. Vara followed Dr. Spector's recommendation without independent investigation. Id. at 16. The court found that although Dr. Vara stated that he did not independently investigate the basis for Dr. Spector's recommendation, he did request information regarding his performance from Dr. Spector, as well as data regarding the productivity and quality of his records. Finally, there was no evidence that Dr. Spector generally controlled the personnel decisions in the department, or that Dr. Vara regularly approved his recommendations. As such, there was insufficient evidence to support Dowlen's "cat's paw" theory. Id. at 17. The district court also held that the comment made by Dr. Rodriguez to Dowlen regarding Dr. Spector's desire to terminate older doctors was an inadmissible hearsay statement which could not be considered on a motion for summary judgment. This appeal followed.

## II. DISCUSSION

Dowlen argues that because there was conflicting testimony regarding the truth of the legitimate, nondiscriminatory reasons given by Dr. Spector for his termination, the district court erred in granting summary judgment in this case.

10

Specifically, he asserts that he provided evidence that: (1) he actually saw more than the number of patients he was asked to see; (2) the cancelling of some cystoscopy procedures was for the patient's safety and was done infrequently; (3) he was not certified to teach the residents, and therefore had little or no interaction with them; (4) Dr. Spector never discussed his concern regarding his patient notes with him; and (5) the number of laboratory tests ordered by him were necessary to avoid cancelling cystoscopy procedures, and they were ordered stat to minimize wait times. Dowlen also argues that various statements made by Dr. Spector were circumstantial evidence of age discrimination, which when combined with the disputed issues and Dowlen's prima facie case of age discrimination, was sufficient such that the matter should be decided by a neutral factfinder, and summary judgment was inappropriate.[1]

We review a district court's grant or denial of summary judgment de novo. Weeks v. Harden Mfg. Corp., 291 F.3d 1307, 1311 (11th Cir. 2002). Summary judgment is appropriate when the evidence, viewed in the light most favorable to

---

[1] Procedurally, it is unclear whether the district court notified Dowlen that it intended to rule on the summary judgment motion within ten days, as required by Fed. R. Civ. P. 56(c); see also Burns v. Gadsen State Cmty. College, 908 F.2d 1512, 1515-17 (11th Cir. 1990) (per curiam). However, even if the court did not provide Dowlen with notification, any error in this regard appears harmless, as Dowlen timely responded to the motion with a brief in opposition and various supporting affidavits. See Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 913 (11th Cir. 1993) ("Failure to notify is harmless error where all of the parties are aware of the conversion and make all of the arguments and submit [] all the documents they would have presented had they received the notice.") (quotation omitted).

11

the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986). The court should give credence to evidence favoring the non-movant as well as "uncontradicted and unimpeached" evidence from disinterested witnesses that supports the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151, 120 S. Ct. 2097, 2110 (2000). However, "inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir. 1999) (quotation and citation omitted).

A party moving for summary judgment has the burden of showing there is no genuine issue of fact. Eberhardt v. Waters, 901 F.2d 1578, 1580 (11th Cir. 1990). A party opposing a motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing a genuine issue for trial. Id. In other words, the nonmoving party must provide more than a "mere scintilla of evidence" to survive such a motion, and there must be a sufficient conflict in evidence to support a jury question. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc).

The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation,

12

terms, conditions, or privileges of employment, because of such individual's age."

29 U.S.C. § 623(a)(1). The ADEA applies to individuals who are at least 40 years

old. 29 U.S.C. § 631(a). "In proving an age discrimination claim, a plaintiff can

establish a prima facie case of discrimination through either direct evidence of

discrimination or . . . circumstantial evidence." Damon v. Fleming Supermarkets

of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999).

Where, as here, a plaintiff offers circumstantial evidence to prove a claim of

discrimination under the ADEA, we use the analytical framework established by

the Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817

(1973). Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 n.6 (11th Cir. 2001).

"Under the [McDonnell Douglas] framework, the plaintiff must first establish a

prima facie case of discrimination." Chapman v. AI Transport, 229 F.3d 1012,

1024 (11th Cir. 2000). If the plaintiff establishes a prima facie case, the employer

must then offer legitimate, nondiscriminatory reasons for the employment action to

rebut the presumption. Id. If the employer does so, the plaintiff, in turn, may

overcome the employer's asserted legitimate reasons and avoid summary judgment

"either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence." Taylor v. Runyon, 175 F.3d 861, 867 (11th Cir. 1999) (quotation, citation and emphasis omitted).

The plaintiff, however, "must meet [the proffered legitimate] reason head on and rebut it, and the employee cannot succeed simply by quarreling with the wisdom of that reason." Chapman, 229 F.3d at 1030. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Id. at 1024-25.

In this case, Dowlen did not present any evidence to rebut the VA's contention that he was terminated because he failed to see the required number of patients. Dr. Dowlen was expected to see 20 patients a day in the urology clinic, and to perform 10 cystoscopies a day on Fridays. By Dowlen's own account, in 2005 he saw 10 to 12, possibly 14, patients a day on Thursdays when he did prostatic biopsies, he averaged 12 or 14 patients a day on Tuesdays and Wednesdays, of which Darly Benosh, the physician's assistant, saw approximately half, and he averaged between 5 and 7 cystoscopies a day on Fridays. Dowlen acknowledged that he was told by Dr. Spector in February 2006 that he was expected to see 20 patients a day in the clinic, and to perform 10 cystoscopies a

14

day on Fridays. Following his conversation with Dr. Spector, Dowlen stated that he saw on average between 10 and 13 patients a day in the clinic, although he saw over 20 patients on a couple of occasions, and performed an average of 5 cystoscopies a day on Fridays. It is clear that Dr. Dowlen failed to see the required number of patients, either at the clinic, or in performing the cystoscopies.

Although Dowlen claimed that the low numbers of patients he saw was through no fault of his own, but rather was due to scheduling problems and to long wait times for lab results, Dr. Kava, who worked in the same clinic, testified that he saw 50 to 60 patients a day, and other testimony indicated that seeing 20 patients a day was not only reasonable, but standard for clinic physicians. Further, not only was there an indication in this case that Dowlen ordered an excessive number of lab tests, which necessarily increased delays due to waiting for lab results, but that the tests he ordered were unnecessary.

Dowlen stated four reasons for his belief that his termination was due to age – the statement from the EEOC agency representative "that he might have an age issue," Dowlen's belief that problems started after Dr. Spector's appointment as Chief of Surgery, Dr. Spector's statement that he was "too fixed in his ways," and Dr. Rodriguez's comment about Dr. Spector wanting only young doctors. As an initial matter, neither the statement from the EEOC agency representative or

15

Dowlen's belief of when problems started are evidence, and therefore have no bearing on the issue at hand. The remaining two reasons, Dr. Spector's and Dr. Rodriguez's statements, provide, at most, a "mere scintilla of evidence," which is insufficient for overcoming summary judgment on his claims. See Mendoza, 195 F.3d at 1244. Further, the statement made by Dr. Rodriguez to Dowlen constitutes inadmissible hearsay, as it is an out of court statement presented for the purpose of establishing the truth of the matter asserted, and it fails to fall within one of the stated exceptions to the hearsay rule. See Fed. R. Evid. 801(c). It therefore cannot be considered on a motion for summary judgment. See Macuba, 193 F.3d at 1322.

## III. CONCLUSION

Accordingly, Dowlen failed to demonstrate that the VA's stated reason for his termination, his poor performance in relation to seeing the required number of patients, was pretextual. Therefore, the VA was entitled to summary judgment on his claim, see Chapman, 229 F.3d at 1024-25, and the district court did not err in granting summary judgment in favor of the VA.

**AFFIRMED.**