[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 24, 2009
THOMAS K. KAHN
CLERK

No. 08-15400
Non-Argument Calendar

_____

D. C. Docket No. 07-00109-CV-CC-1

GEOVING JOSEPH GERARD,

Plaintiff-Appellant,

versus

BOARD OF REGENTS OF THE STATE OF GEORGIA,
GEORGIA INSTITUTE OF TECHNOLOGY,

Defendants-Appellees,

GEORGIA TECH RESEARCH INSTITUTE,
GEORGIA TECH RESEARCH CORPORATION,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 24, 2009)

Before BIRCH, BLACK and BARKETT, Circuit Judges.

PER CURIAM:

Geoving Joseph Gerard ("Gerard"), a naturalized African-American male from Haiti, appeals, through counsel, the district court's grant of summary judgment in favor of his former employer, the Board of Regents of the State of Georgia and Georgia Institute of Technology,[1] on his claims of racial discrimination and retaliation brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a), 3(a). In his amended complaint, Gerard alleged, inter alia, that: (1) he was denied a promised position because Georgia Tech retaliated against him for failing to withdraw a December 2005 letter charging officials with age, race, national origin, and color discrimination; and (2) Georgia Tech failed to hire him for a position on the basis of his age, race, and color, or protected activities.[2]

Gerard makes two arguments on appeal. First, he contends that evidence showed that he engaged in protected activity, that a causal connection existed

---

[1] Gerard also sued two other defendants, the Georgia Tech Research Institute ("GTRI") and Georgia Test Regional Corporation ("GTRC"), and asserted certain state law claims. His claims against GTRI and GTRC are not at issue on appeal. Moreover, because Gerard does not challenge the district court's dismissal of his state law claims on appeal, any claims in this respect are waived. See Kelliher v. Veneman, 313 F.3d 1270, 1274 n.3 (11th Cir. 2002). The remaining defendants will be referred to collectively as "Georgia Tech."

[2] Gerard raised numerous other claims in his complaint, however, because he does not challenge them on appeal, they are deemed waived. See Kelliher, 313 F.3d at 1274 n. 3.

2

between such activity and an alleged withdrawal of promised work, and that the latter act was retaliatory. Second, he argues that a genuine issue of material fact exists as to whether the refusal to hire him was discriminatory or retaliatory. After careful consideration of the record evidence and the parties' briefs, we conclude that the district court did not err in granting summary judgment in favor of Georgia Tech. Accordingly, we AFFIRM.

## I. BACKGROUND

Gerard began working for Georgia Tech in 1982 while still a student.[3] R4-64 at 39, 42. He was subsequently hired as a full-time Chemical Technician in October of 1985. Id. at 45. Gerard remained in that position until 2002 when his position was reclassified to that of Program Coordinator I, at which time Herbert Michael Harris ("Harris") became his supervisor. Id. at 70, 74-75; R3-61, Exh. D at 2-3. According to Harris, Gerard's duties as a Program Coordinator involved managing a database, placing orders, paying vendors, maintaining inventory, and preparing monthly reports, all related to the GTRI compressed gas/liquid gas program. R3-61, Exh. D at 3. After an internal reorganization, the handling of chemical canisters became automated. As a result, Gerard's services were no

---

[3] Because our review is of the district court's grant of summary judgment in favor of Georgia Tech, we take the best set of facts for Gerard. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

3

longer required and funding became insufficient to support his position.  Id. at 4.

On 5 December 2005, Harris sent Gerard a letter informing him that because of the lack of funding, his employment would be reduced by fifty percent on 1 January 2006, with a termination date of 1 February 2006.  Id.; R4-64 at 125-26.  Gerard's termination date was extended to 6 March 2006 after additional funds were made available.  R3-61, Exh. D at 5.  Harris notified Gerard of the extension in a letter dated 20 February 2006.  Id.

After being notified of his impending termination, Gerard responded in the following manner.  First, on 16 December 2005, he filed a complaint with the Georgia Commission on Equal Opportunity ("GCEO"), alleging failure to hire and failure to promote.  Exh. Folder 1, Exh. 7 at 1-4.  Then on 3 January 2006, he filed another complaint with the GCEO, alleging improper discharge and failure to hire.  Exh. Folder 1, Exh. 12 at 1-3.  Both of Gerard's GCEO complaints ultimately were dismissed for lack of timeliness.  Exh. Folder 1, Exh. 7 at 8-9.

In addition to his GCEO complaints, Gerard appealed his termination to Elizabeth Neely ("Neely") of the Office of Legal Affairs of the Board of Regents ("Office of Legal Affairs") and sent a letter to Stephen Cross, the director of GTRI.  Exh. Folder 1, Exhs. 23 & 24.  In his letter to Cross ("December 2005 letter"), Gerard sought to inform him about what was happening within GTRI, explain his

4

experiences, and request an investigation into what led to his termination notice. Exh. Folder 1, Exh. 24. Gerard described the organization as a "family circus" in which hiring was based on nepotism, and wrote:

> You have your work cut out. You have to work your way past a long established and very powerful triumvirate of women who, either at will or by manipulations, makes the rainfalls and the sunshine in your organization. One cannot beg to differ with them. It is their way or no way. It is with sadden heart that I must say; after being out of Haiti for 35 years and away from the brutal regime of Papa Doc, his Tonton Macoute and the Boogie Man; that I feel living the era all over again.

Id. at 3. After detailing his personal experiences and work history at Georgia Tech, Gerard proceeded to describe how he was not permitted to take classes at Georgia Tech, given deserved promotions, or provided with adequate pay raises. Id. at 5-13). Included within his December 2005 letter was the memorandum that he sent to Neely of the Office of Legal Affairs, in which he stated that he was wronged by not being selected to oversee a new chemical management system and that his "termination [was] a by-product of political corroborations among administrators and directors in GTRI to block and deny me openly advertised and available positions." Id. at 9-13. He closed the memorandum to Neely by writing:

> In finality, I am hereby claiming reparation for

5

> suppressed reclassifications, fair salary denial and am asking for current salary commensurable with the new GTRI Chematix Administrator position for which I worked hard and therefore I rightfully deserve.
>
> Unless, of course, that is too much for a Negro with a colonial French accent from a third world country to be reclassified and ascended to the rank of GTRI administrator.

Id. at 13. Gerard concluded his December 2005 letter, in part, by stating that he "believed [sic] to have been discriminated against for being too rhetorical and philosophical at times." Id. at 14. In his deposition, Gerard claimed that he requested that the December 2005 letter be included in his personnel file but conceded that he did not know if the personnel department complied with his request. R4-64 at 301-02.

In the interim, Harris, Gerard's supervisor, attempted to secure Gerard a position in another department at Georgia Tech. First, he contacted Steve Woodall ("Woodall") and inquired about a position for Gerard with the Research Security Department. R3-61, Exh. D at 6. Although Woodall initially agreed to provide coverage for Gerard, he was forced to withdraw the offer after he learned that his department no longer had the requisite funding. Id.

Harris also contacted Ann Batchelor ("Batchelor"), the Deputy Director of the Military Sensing Information Analysis Center ("SENSIAC") about a possible

6

long-term assignment for Gerard in her department. Id. at 7; R3-61, Exh. A at 1-3. After being contacted by Gerard and Harris, Batchelor consulted with GTRI Personnel Support and the Laboratory Director and "was directed to review [Gerard's] personnel file," which was a common practice when considering someone for long-term employment. R3-61, Exh. A at 3-4. When doing so, Batchelor came across Gerard's December 2005 letter to Cross and was dismayed at its "unprofessional and unnecessarily hostile" tone. Id. at 4. Batchelor was especially bothered by Gerard's reference to "a long established and very powerful triumvirate of women who, either at will or by manipulations, makes rainsfalls and the sunshine in your organization" because it indicated an animosity towards women, of whom Batchelor's group was largely comprised. Id. at 5. She also was disturbed by Gerard's comparison of GTRI to the "brutal regime of Papa Doc, his Tonton Macoute and the Boogie Man," which she viewed as a particularly undeserving analogy. Id. As a result, Batchelor did not think that Gerard would be a "positive or productive addition" to her staff, and at a meeting on 6 February 2006, she told Gerard that, in light of his unresolved grievance in his personnel file, she would not employ him. Id. at 6-7.

In his deposition, Gerard testified that Batchelor told him that if he withdrew his complaint from his personnel file, then she would reconsider her decision to

withdraw his work assignments. R4-64 at 319-21. Gerard reiterated this assertion in a 13 February 2006 letter to Neely, in which he claimed that he was being retaliated against because of his December 2005 letter to Cross. Exh. Folder 1, Exh. 27 at 1-2. Although Batchelor flatly denied offering any such quid pro quo arrangement, Gerard nevertheless filed another complaint with the GCEO, alleging failure to hire by Batchelor. R3-61, Exh. A at 7; Exh. Folder 1, Exh. 26 at 5. He claimed that while there was not an actual open position available, he nevertheless was promised work within SENSIAC. R4-64, at 286-87. He conceded that he did not know if anyone was hired in his stead. Id. at 291.

On 18 February 2006, Gerard wrote a letter to Woodall and Batchelor, apologizing to both for "implicating" them in his "retaliation complaints." Exh. Folder 1, Exh. 32. He wrote that he was aware that the "persons who release the guillotine are not necessarily the victim's decapitators [sic]." Id. He also stated that "[s]ince you were placed in the line of fire, as sacrificing lambs at my cross-hair position, I was left with no choice [but] to utilize you as targets for my complaints." Id. Gerard concluded the letter by noting that Batchelor "can redeem [herself] to [her] God." Id. After reading the letter, Batchelor noted that "the unbalanced and threatening tone of [the] correspondence further confirmed [her] discomfort with Mr. Gerard's employment within SENSIAC or GTRI." R3-

8

61, Exh. A at 7.

Although Harris, Gerard's supervisor, diligently continued to attempt to find coverage for Gerard with other departments, he was unable to do so and issued Gerard a "lack of funding" letter on 20 February 2006, specifying Gerard's final termination date as 6 March 2006. Id., Exh. D, App. 2. In response, Gerard applied for seventeen positions at Georgia Tech between 27 February 2006 and 12 May 2006. Id., Exh. H at 4. According to Debbie McCloud ("McCloud"), an employment manager in Georgia Tech's human resources department, Gerard used Georgia Tech's online application process to apply for the positions. Id. at 1-3. The online applications do not ask for information regarding age, gender, national origin, race, or color, nor do they inquire as to previous EEOC charges or complaints against Georgia Tech. Id. at 3. If an applicant does not meet the minimum requirements of a position, the application is not forwarded by human resources to the hiring department for further review. Id. If an applicant's application and resume appear to meet the minimum qualifications, the applicant is referred to the department's hiring manager who then reviews the referred applications, narrows the applicant pool, and contacts applicants for interviews. Id. at 3-4. Gerard was not selected for any of the positions for which he applied.

On 30 June 2006, Gerard filed another complaint with the GCEO, alleging

9

failure to hire him for any of the positions that he had applied for with Georgia Tech. Exh. Folder 1, Exh. 39 at 1-3. He later filed the present suit. R1-1. Because we are concerned only with those issues before us on appeal, our sketch of the relevant factual background will cover only the circumstances surrounding Gerard's application for the Project Coordinator I position.

Terry Bridges ("Bridges"), the Associate Director of Personnel Support Team, served as the hiring manager for the Project Coordinator I position, which involved reviewing contracts, serving as an interface for contracts between labs, government agencies, and other departments, and monitoring the implementation of databases to ensure compliance with contract requirements. R3-61, Exh. C at 1-3. According to Bridges, "[t]he hiring criteria for this position required four or more years of job related experience and a preference for working knowledge of various government forms and the ability to read and understand sponsored contracts." Id. at 2-3. Ultimately, Bridges selected Palla Smith for the position based on her experience both in a university setting and "working closely with contracts, including monitoring and closing out contracts," and because she demonstrated in her interview that "she possessed the ability to interpret contracts as they relate to property." Id. at 3. Bridges noted that although Gerard met the minimum qualifications for this position, he was not chosen because he had less

10

relevant job experience and he "lacked experience managing contract[s] and subcontracts." Id.

Gerard countered that he had a degree in business administration and computer information systems but conceded that he indicated on his employment application that he had only completed up to grade twelve. R4-64 at 18-19. Gerard also acknowledged that he did not have four or more years interpreting, monitoring, or closing out property contracts. Id. at 373.

According to Smith's application, she had been an assistant research administrator at Emory University since 2004, and prior to that, she was an administrative assistant at Emory for five years. R3-61, Exh. C, App. 2 at 1-3. Smith had a two-year nursing degree and had completed three years towards a degree in managerial sciences. Id. at 1. In Smith's last position with Emory she was "[r]esponsible for close-out requirement[s] of routine projects and related files and database entries." Id. at 2.

Georgia Tech responded to Gerard's complaint by filing a motion for summary judgment. R3-61. The case was sent to a magistrate judge who duly issued a final report and recommended that summary judgment be granted on the majority of Gerard's claims because he failed to exhaust his administrative remedies. R5-73 at 24-25, 27-28. The magistrate judge also recommended

11

granting summary judgment in favor of Georgia Tech on Gerard's remaining claims. See id. at 33, 42, 53. Because the magistrate judge found that Gerard presented no direct evidence in support of his remaining discrimination and retaliation claims, he applied the burden shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25 (1973).

Specifically, with respect to Gerard's claim that he was denied a promised position within SENSIAC, the magistrate judge found that Gerard did not establish a prima facie case of discrimination, because no SENSIAC position existed and he did not demonstrate that he was replaced by someone outside of his protected class. Id. at 33. Regardless, the magistrate judge found that Georgia Tech gave a legitimate, non-discriminatory reason for not providing Gerard with continuing coverage, in that "Batchelor determined that he would not be a positive or productive addition to her staff because she believed [he] harbored animosity towards women," and Gerard did not demonstrate pretext, or show that Batchelor was motivated by discriminatory intent. Id. at 34-35.

Moreover, the magistrate judge determined that Gerard did not establish a prima facie case of retaliation because his December 2005 letter to Cross did not allege discrimination based on any protected status and thus was not protected activity. Id. at 37-38. The magistrate judge also found that Gerard failed to show a

12

causal connection between his GCEO charges and any adverse action, because he did not show that any decision-maker knew of his GCEO charges before making a hiring decision. Id. at 39-42.

With respect to Gerard's refusal to hire claim, the magistrate judge concluded that Georgia Tech had a legitimate, non-discriminatory reason for hiring Smith for the Project Coordinator I position based on her relevant experience and Gerard failed to show pretext. Id. at 44-45. Moreover, the magistrate judge found that Gerard did not show that he was "so clearly more qualified" than Smith because he did not have more experience than Smith in interpreting contracts, a key requirement for the Project Coordinator I position. Id. at 46-47. The district court adopted the magistrate judge's report and entered summary judgment for Georgia Tech on Gerard's federal claims. R5-77.

Gerard appeals the district court's grant of summary judgment in favor of Georgia Tech on two of his claims and makes the following arguments. First, he contends that he was denied a position in Batchelor's SENSIAC department in retaliation for engaging in a protected activity – i.e., filing his GCEO grievances and submitting his December 2005 letter to Cross. Second, Gerard argues that he was refused the Project Coordinator I position because he previously had filed a retaliation claim with Georgia Tech. We consider each argument in turn.

13

## II. DISCUSSION

We review a district court's grant of summary judgment <u>de</u> <u>novo</u>, viewing all of the facts in the record in the light most favorable to the non-moving party. <u>Brooks v. County Comm'n of Jefferson County, Ala.</u>, 446 F.3d 1160, 1161-62 (11th Cir. 2006). Summary judgment is appropriate where the moving party demonstrates, through "pleadings, the discovery and disclosure materials on file, and any affidavits" that no issue of material fact exists, and they are "entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(c). "A party moving for summary judgment has the burden of showing that there is no genuine issue of fact." <u>Eberhardt v. Waters</u>, 901 F.2d 1578, 1580 (11th Cir. 1990) (quotation marks and citation omitted).

"A party opposing a properly submitted motion for summary judgment may not rest upon mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> (quotation marks, alteration, and citation omitted). "All evidence and reasonable factual inferences therefrom must be viewed against the party seeking summary judgment." <u>Id.</u> (citation omitted). Speculation or conjecture from a party cannot create a genuine issue of material fact. <u>See</u> <u>Cordoba v. Dillard's, Inc.</u>, 419 F.3d 1169, 1181 (11th Cir. 2005). "A mere scintilla of evidence in support of the nonmoving party will

14

not suffice to overcome a motion for summary judgment." Young v. City of Palm Bay, 358 F.3d 859, 860 (11th Cir. 2004).

Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). When considering a Title VII motion for summary judgment involving circumstantial evidence, the district court analyzes the case using the framework set out in McDonnell Douglas. See McDonnell Douglas Corp., 411 U.S. at 802-04, 93 S. Ct. at 1824-25. The McDonnell Douglas burden-shifting framework is also used by courts to analyze claims of indirect evidence of racial employment discrimination and retaliation claims. See Holifield v. Reno, 115 F.3d 1555, 1564-66 (11th Cir. 1997) (per curiam). Because Gerard's claims are based solely on circumstantial evidence, the McDonnell Douglas framework applies.[4]

Under McDonnell Douglas, the plaintiff bears the initial burden of presenting sufficient evidence to allow a reasonably jury to determine that he has

---

[4] Gerard challenges the district court's application of the McDonnell Douglas burden-shifting framework for the first time in his reply brief. Because we do not consider issues raised for the first time in a reply brief on appeal, we disregard Gerard's challenge. See Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004).

15

satisfied the elements of his prima facie case. McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824. If a prima facie case is established, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. Id. If articulated, the plaintiff must show that the defendant's reason was pretextual. Id. at 804; 93 S. Ct. at 1825. The employer's articulated reason is legitimate as long as it is honestly and reasonably held. See Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) he engaged in statutorily protected expression; (2) his employer subjected him to an act that would have been materially adverse to a reasonable employee or job applicant; and (3) there is some causal relation between the two events. See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68-69, 126 S. Ct. 2405, 2411-12, 2414-15 (2006) (announcing "materially adverse" element); Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir. 2001). Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits. See Pipkins, 267 F.3d at 1201. An employer's refusal to hire is a materially adverse action. See Burlington N. & Santa Fe Ry. Co., 548 U.S. at 67-68, 126 S. Ct. at 2414-15 (holding that the "scope of the anti-retaliation

16

provision extends beyond workplace-related or employment-related retaliatory acts and harm").

To establish the causal connection required by the third prong, the plaintiff must show that (a) "the decision-makers were aware of the protected conduct;" and (b) "the protected activity and the adverse [employment] action were not wholly unrelated." McCann v. Tillman, 526 F.3d 1370, 1376 (11th Cir.) (quotation marks, alteration, and citations omitted), cert. denied, 129 S. Ct. 404 (2008). "[C]lose temporal proximity may be sufficient to show that the protected activity and the adverse [employment] action were not wholly unrelated" for a prima facie case. Id. (quotation marks and citation omitted). However, "temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." Brungart v. BellSouth Telecomms., Inc., 231 F.3d 791, 799 (11th Cir. 2000) (citation omitted).

If a plaintiff makes a prima facie showing of retaliation, and the employer offers a legitimate, non-discriminatory reason for the employment action, the plaintiff must then come forward with evidence sufficient to permit a reasonable fact finder to conclude that the reasons given by the employer were pretextual. See Holifield, 115 F.3d at 1566.

17

To show pretext, the plaintiff must present sufficient evidence "to permit a reasonable fact finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997) (citation omitted). Conclusory allegations, without more, are insufficient to show pretext. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376-77 (11th Cir. 1996). Instead, the plaintiff must meet the proffered reason "head on and rebut it." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). Unsupported assertions are not evidence of pretext. See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1332 (11th Cir. 1998) (noting that "a naked assertion is not evidence of pretext, especially when the uncontroverted evidence suggests that the statement was in fact true"). Moreover, summary judgment is proper where the defendant offers legitimate reasons and the employee only offers temporal proximity. See Wascura v. City of S. Miami, 257 F.3d 1238, 1247 (11th Cir. 2001) (affirming summary judgment for employer where legitimate reasons for the termination decision were offered by the defendant and employee presented virtually no evidence of discrimination, other than temporal proximity of the events).

A. Withdrawal of "Promised" SENSIAC Position

The district court did not err by granting Georgia Tech's motion for

18

summary judgment on Gerard's retaliatory withdrawal of promised work claim. We conclude that Gerard's December 2005 letter to Cross did not constitute statutorily protected expression, because it laid out a list of grievances, but did not indicate that he was discriminated against based on his membership in a protected group. In fact, his letter contained one mention of race, which, when taken in context, did not assert a claim for racial discrimination. This "scintilla of evidence" was insufficient to overcome Georgia Tech's motion for summary judgment. See Young, 358 F.3d at 860.

While Gerard's other charges of discrimination, e.g., his GEOC complaints, were protected activity, the evidence does not show that Batchelor was aware of them when she decided to not offer Gerard a position in her department. Gerard speculates that Batchelor was aware of the complaints because she did not affirmatively deny knowing of them in her affidavit, but, as we previously have noted, speculation does not create a genuine issue of material fact. See Cordoba, 419 F.3d at 1181. Because the record evidence shows that Batchelor's discomfort with Gerard stemmed largely from his comparison of Georgia Tech officials to the "brutal regime of Papa Doc, his Tonton Macoute and the Boogie Man," and from his generally unbalanced and hostile tone in other correspondence with her, we find that she had a legitimate reason for refusing to hire him. See Elrod, 939 F.2d

at 1470. Moreover, the record does not show any evidence of, and Gerard does not argue, pretext.

Because Gerard failed to show that (1) he engaged in protected activity in late 2005 and early 2006, (2) a causal connection existed between such activity and the alleged withdrawal of promised work by Batchelor, or (3) this act was retaliatory, we affirm the district court's grant of summary judgment in favor of Georgia Tech on Gerard's withdrawal of promised work claim.

B. Refusal to Hire (Project Coordinator I) Claim

We also conclude that the district court did not err in granting summary judgment in favor of Georgia Tech on Gerard's refusal to hire claim. Although Gerard contends that Bridges, the decision maker, knew of his protected retaliation claim – because he forwarded to Bridges copies of his February 2006 letter to Neely, in which he clearly laid out his claim for retaliation – we find that the Neely letter cannot be construed as protected activity because, although it mentioned retaliation, it did not mention race, color, or national origin, nor did it allege that Gerard was subjected to discrimination on the basis of race, color, or national origin. See Exh. Folder, Exh. 27 at 1-2. Moreover, there is no evidence that Bridges knew of Gerard's GCEO charges prior to making his hiring decision. Additionally, even if Gerard established that his qualifications were equal to those

of Smith, Georgia Tech provided legitimate, non-discriminatory reasons for hiring Smith, namely, that she had experience both in a university setting and "working closely with contracts, including monitoring and closing out contracts," and that she "possessed the ability to interpret contracts as they relate to property." R3-61, Exh. C at 3.

Finally, Gerard provided no evidence that Georgia Tech's reasons for not hiring him were pretextual. Although Gerard filed his GCEO complaints in late 2005 and early 2006, shortly before Georgia Tech's refusal to hire him in April 2006, we conclude that this temporal proximity alone does not show pretext. See Wascura, 257 F.3d at 1247. While Gerard attempts to rebut Georgia Tech's contention that his qualifications were inferior to those of Smith by attacking Smith's education, experience, grammar, and resume, he ultimately fails to meet Georgia Tech's reason for hiring Smith head on, and rebut it, as required by our precedent in this area. See Chapman, 229 F.3d at 1030. Further, he presents no arguments, and there is no evidence, that Georgia Tech's reasons for hiring Smith instead of him were not legitimate.

## III. CONCLUSION

Gerard appeals the district court's grant of summary judgment in favor of Georgia Tech on his claims of discrimination and retaliation. After careful

21

consideration of the record evidence and the parties' briefs, we conclude that the district court did not err in granting summary judgment in favor of Georgia Tech. Accordingly, we AFFIRM.