[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17086

_____

D.C. Docket No. 1:13-cv-02922-LMM

LEWIS ATCHISON,

Plaintiff–Appellant,

versus

THE BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF GEORGIA,
d.b.a. Georgia Institute of Technology,
JAMES BURNS NEWSOME, et al.,

Defendants–Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 13, 2020)

Before ANDERSON and MARCUS, Circuit Judges, and ROTHSTEIN,[*] District
Judge.

---

[*]    Honorable Barbara J. Rothstein, United States Senior District Judge for the Western
District of Washington, sitting by designation.

PER CURIAM:

Lewis Atchison appeals the district court's partial grant of the Board of Regents'[1] motion to dismiss and grant of summary judgment in favor of the Board. On appeal, he argues that the district court erred in granting the Board summary judgment on his retaliation and anti-interference claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973. After careful review of the record before us, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

A.  Atchison's Disciplinary History

Lewis Atchison first enrolled at the Georgia Institute of Technology in 1997.[2] Because he was diagnosed with attention deficit hyperactive disorder ("ADHD") and dyslexia, he requested testing accommodations from the school shortly after his enrollment. Specifically, he requested "a quiet, non-distracting environment for studying and testing" and "extra time to complete tests." Georgia Tech granted his requests.

A tumultuous 9 years followed. In March 1999, Atchison was charged with "Disorderly Conduct" following incidents that "involved an attempted theft at the

---

[1] Hereinafter, when describing the collective actions of the defendants, we will refer to them collectively as the "Board" or the "Board of Regents."

[2] Georgia Tech is a public university in Atlanta, Georgia, that is a member of the University System of Georgia, a government agency governed by the Georgia Board of Regents.

Library, an incident with his roommate, and computer misuse in the Rich Building." The case was handled administratively by Karen Boyd, the Senior Associate Dean of Students, and Atchison waived his right to an appeal. He received a "Disciplinary Warning" for his conduct.

In November 1999, Atchison was again charged with non-academic misconduct—this time, relating to "disorderly conduct, aggressive behavior, and resisting arrest." Though accounts differ as to what happened, the record supports a determination that Atchison parked his car in an impound lot during the Thanksgiving break and when he returned, it had been impounded. When he discovered that his car had been impounded, he apparently "became aggressive, [the] police arrived, [and he] resisted arrest." The matter was again handled administratively by Boyd and Atchison again waived his right to an appeal. Atchison was put on "Disciplinary Probation through [the] end of Spring 2000" as punishment. Three subsequent events occurred, on September 8, 2000; October 13, 2000; and January 4, 2002, involving conduct that is not clear from the record.[3]

Atchison's first major incident occurred in 2003, when he was suspended from December 2003 to August 2004 for "hit[ting] somebody with open palms and

---

[3] These incidents have an "FYI" designation next to them on the report of Atchison's disciplinary history produced by Georgia Tech. According to an email from Gary Wolovick, Georgia Tech's in-house counsel, the "FYI" designation refers to "incidents where no disciplinary action was taken but [was] noted to [Atchison's] file."

threatening the person's life." According to Atchison's version of events, he had "an argument with this graduate student roommate because he refused to stop playing loud music late at night. When I pushed him, it was because he was right up in my face yelling at me." He was charged with "Assault" and "Endangering Behavior." The Undergraduate Judiciary Cabinet recommended that he be suspended from December 18, 2003, to August 15, 2004, and be required to complete an anger management course. Dean Boyd accepted the Cabinet's recommendation and warned Atchison, "Lewis, you have been given ample opportunity to learn to not interact with others in this manner. Your two prior judicial incidents indicated that you . . . needed to learn to better channel your anger. In each of those incidents, members of the Georgia Tech community expressed concern that you *might* become physically violent." Atchison was "warned that further violations might result in Expulsion." He appealed the determination to Vice-President Lee Wilcox, who affirmed Boyd's decision. This suspension was reflected in his transcript, which showed that no courses were taken after Fall 2003 until Spring 2005.

After Atchison was able to take classes again at Tech, he was suspended once again for violent conduct that took place in February 2005. Though the facts of what happened are disputed, it is clear that Atchison was on the silent floor of the university's library when some other students were talking "in some foreign

language" at a volume that he considered inappropriate.  He alleged that he told them to be quiet, and in response, they cursed at him.  Atchison apparently grew violent and aggressive in response, with the two library security guards responding to the incident hearing him "say that he would cut off [one of] the student's head." He was charged with "Intentionally pushing, unjustifiably striking, or physically assaulting or otherwise intentionally causing reasonable apprehension of such harm to any person" and "Disorderly conduct including but not limited to: breach of the peace" for being "Disruptive in library including threats."  Atchison contested the charges and they were again addressed at an Undergraduate Judiciary Cabinet hearing.  Atchison submitted the handwritten notes of a supposed eyewitness to the event, as well as the eyewitness's brother's testimony, but this evidence proved unavailing—the handwritten notes supported the charged version of events, in that Atchison cursed at the other students and seemed to suggest that they fight.  The other eyewitnesses called by Atchison were not actually present for the events in question.

Following its hearing, the Cabinet recommended that Atchison be expelled, but Dean Boyd intervened and instead changed the penalty to a two-semester suspension, from February 10, 2005, to August 21, 2005, because "it was not the *best* decision that could be rendered when looking at the entirety of Mr. Atchison's behavior, history, and potential."  Atchison was also required to do advanced anger

management training, was advised that any further misconduct would result in expulsion, was informed that a criminal trespass order had been issued to the Georgia Tech Police Department, and upon his return, he was to be "limited to only the parts of campus that are absolutely necessary for him to complete his Tech education and then only at the times necessary for completion," was not "permitted to live in Institute Housing," would be "severely limited in his access to the library," and would be "required to take distance-learning courses where possible."

Atchison appealed the decision to the Student Grievance and Appeal Committee, which concluded that it was "disturbingly similar" to the previous offenses. It noted, "The first incident, in fall 2003, involved his inappropriate and aggressive response to the noise of light fixtures and other noise in university housing, and this second incident involves his inappropriate and aggressive response to talking on a quiet floor in the library." The Committee recommended his appeal be dismissed. William D. Schafer, the Vice-President for Student Affairs, accepted the recommendation and rejected Atchison's appeal.

Following his suspension, Atchison filed a writ of *certiorari* with the Fulton County Superior Court, and alleged that he was prevented from enrolling at Tech. The court entered an order requiring that he be allowed to register and enroll for classes scheduled to begin in the 2006 Winter semester. Following the court's

order, Atchison was involved in two more incidents—on December 20, 2005, and June 16, 2006—in which no disciplinary action was taken but was noted in his file.

Atchison was expelled in Fall 2006. The charges related to two incidents from that year's spring semester, in which he was charged with having unauthorized materials on a quiz and a test. Prior to the exam, Atchison received an email from Tawanna Wilson, who worked in Tech's student accommodations office, informing him that he was allowed "AN APPROVED ONE PAGE CHEAT SHEET CONTAINING ONLY FORMULAS AND GRAPHS WITH NO NOTATIONS OR EXPLANATIONS OF SYMBOLS. IT MUST BE A [sic] ORIGIANL [sic] HANDWRITTEN CHEAT SHEET, IT CANNOT BE PHOTOCOPIED." Nonetheless, Atchison brought a "cheat sheet" containing "several pages that were all highly reduced by photocopy, cut and pasted onto the back of the single sheet. His cheat sheet also contained verbiage well beyond just formulas and graphs."

At the Student Honor Committee hearing convened to adjudicate the charges, Atchison alleged that (1) his professor did not want to bring charges against him; (2) that the charges were manufactured by a member of the student testing accommodations facility as retaliation for complaints he lodged against the facility's proctors; (3) the charges were brought months later, which he alleged was proof that they were fraudulent charges; (4) one of the facility's officials had fished

7

his impermissible "cheat sheet" out of the trash to use against him later; and (5) the cover sheet for his test did not explicitly say what was and was not allowed for the test.

The Committee found him guilty. Afterwards, it was apprised of Atchison's disciplinary history and recommended that he be expelled. Atchison appealed the decision to the Student Grievance and Appeal Committee, which recommended that his appeal be denied. Atchison appealed this decision to Vice-President Schafer through his attorney, Alan Manheim. He alleged, *inter alia*, procedural defects, that the Honor Committee violated the Fulton County Superior Court's order, that he was not able to cross-examine his professor, and that the Honor Committee did not properly weigh the testimony of another student, who alleged that the professor had previously made false statements about him. Dr. Schafer denied Atchison's appeal on October 22, 2006. The university sent Atchison a Notice of Expulsion dated October 24, 2006, which "clearly stated that you have been issued a permanent criminal trespass from the Institute."[4]

B. Atchison's Subsequent Appeals

---

[4] Apparently, sometime after this point, Atchison alleges that he attended class, which prompted the Georgia Tech police to enter his class, handcuff him, and escort him from the building. Though Atchison alleges that this is how he was informed that he had been expelled and that the police were in SWAT gear, we note that there is no support for that in the record other than in Atchison's own deposition statements. The university admitted that he was escorted off campus, but he was apparently arrested in *2009*, well after his *2006* expulsion.

After his expulsion, Atchison continued to appeal the university's decision and repeatedly requested reconsideration or readmission. Insofar as they are relevant to Atchison's current claims, we present them in rough chronological order:

- First, as mentioned previously, Atchison began by appealing his expulsion to the Student Grievance Appeal Committee, and then to Dr. Schafer, both of whom affirmed his expulsion. He appealed Dr. Schafer's decision—as the final university decision—to the Georgia Board of Regents, which affirmed the school's decision in January 2007.

- Second, Atchison filed suit in the Fulton County Superior Court seeking reinstatement. The court dismissed Atchison's complaint as non-justiciable on November 2, 2006. The Georgia Court of Appeals summarily affirmed the superior court's order on September 5, 2007, in an unpublished opinion.

- Third, Atchison repeatedly sought reconsideration from Gary Schuster, Georgia Tech's Interim President. Schuster denied Atchison's request on January 21, 2009; his assistant denied it again on January 22, 2009, presumably on his behalf.

- Fourth, Atchison requested that the Board of Regents reconsider its decision to uphold his expulsion. Vice-Chancellor J. Burns Newsome denied this request on January 28, 2009. His attorney requested that the Board reconsider its decision or grant him a hearing on March 23, 2009. (It is not apparent from the record if the Board responded to this request.)

- Fifth, he again requested reconsideration from the Board of Regents on January 26, 2010, and requested permission to address the Board at its February or March 2010 meetings. The Board replied that it would not revisit its previous determination until George Peterson, the new President of Georgia Tech, had reviewed it. Atchison then reached out to John Stein, the Assistant Vice-

9

President for Student Affairs, to discuss whether Peterson would review his request. Atchison was informed that Peterson would not, but he attempted to deliver a petition for readmission to Peterson anyway on December 21, 2010. On January 7, 2011, he was informed by Gary Wolovick that the university would not reconsider or take any action.

- Sixth, Atchison sought reconsideration from the Board of Regents on March 1, 2011—the reconsideration that is the basis of the underlying litigation. Vice-Chancellor Newsome advised Atchison that he would consult the Board's Organization and Law Committee regarding his request. Atchison attended the Board's meeting on June 7, 2011, in an attempt to deliver his petition to them in person. Newsome subsequently informed Atchison that the Committee would hear his complaint at its August meeting and was later rescheduled for September. Atchison requested an extension to better prepare for his presentation and received an extension to the October meeting. At the October meeting, the Board upheld Atchison's expulsion.

C. Atchison's Subsequent Requests

Independent of his appeals and requests for reconsideration, Atchison engaged in two requests that are relevant for the claims he now asserts: (1) he requested his transcripts so that he could apply to transfer to another university; and (2) he submitted a request to the Board of Regents under Georgia's Open Records Act. We explain each in turn.

First, Atchison has had various holds placed on his Georgia Tech student account since he first enrolled in 1997. The record shows that these holds came in various forms and were triggered by a multitude of events, like poor academic standing (like his expulsion), fines that Atchison owed, outstanding obligations,

10

failure to make loan payments, and so on.  The holds also had different effects, but relevantly for this appeal, some of the holds were on Atchison's ability to request transcripts.  From July 8, 2009, to March 28, 2016, and from May 11, 2010, to March 28, 2016, Atchison had two transcript holds placed on his account by the university bursar's office for failure to pay his Perkins loans.  Because these holds prevented him from obtaining transcripts as part of transfer applications to other schools, he reached out to John Stein, the Assistant Vice-President for Student Affairs, to get the holds lifted.  In his deposition, Stein testified that he was able to temporarily lift the holds on Atchison's account at various points, apparently enabling Atchison to successfully access and send his transcripts.  However, Atchison, both in his contemporaneous emails to Stein and during the course of this litigation, disputes Stein's account, and has repeatedly alleged that the holds were still on his transcripts.

Second, on March 11, 2013, Atchison submitted a request for "appeals letters from each Georgia Tech student petitioning the Board of Regents for review of disciplinary sanctions, from January 1, 2006 to the present."  The Board estimated that "it will take approximately one week for search, retrieval, review and redacting of privileged information and the copying of all responsive documents," with an "approximate cost" of $1,229.63.  On March 21, Atchison

11

contested the cost of the document retrieval and redaction and questioned whether the documents were available electronically.

In response, John Millsaps, the Vice-Chancellor of the Board of Regents, informed Atchison that it had "Twenty-one student appeals from Georgia Tech in the time frame you requested [that] are responsive to your request," that the Board did not know "how many pages are contained in these documents," did not "possess these documents in electronic form," and that the records "are protected by the Family Educational Rights and Privacy Act." Millsaps advised Atchison that he was including a picture of the responsive documents—which we presume was done to give context to how many documents there were. The picture showed two stacks of folders and envelopes on a desk with a red stapler in front of them.

D.  The Underlying Litigation

Atchison filed the present case on August 30, 2013, in the Northern District of Georgia, alleging claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973. He filed his initial complaint *pro se* but was subsequently represented by a number of lawyers through the proceedings. On November 13, 2014, Judge Batten dismissed many of Atchison's claims. Specifically, he dismissed Atchison's discrimination claims, his claims against the defendants in their individual capacities, his section 1983 claims, and his constitutional claims. He rejected the Board's motion to dismiss Atchison's

12

retaliation and intimidation claims.  The case was then reassigned to Judge May, who noted that she only had to address four issues:

1.  Whether the Board had retaliated against Atchison in violation of the ADA and the RA by denying his request for readmission;

2.  Whether the Board had retaliated against Atchison in violation of the ADA and RA by allegedly delaying the re-hearing of his request for admission;

3.  Whether the Board had retaliated against Atchison in violation of the ADA and RA by implementing transcript holds; and

4.  Whether the Board had intimidated or coerced Atchison in violation of the ADA.

As to the first and second issues, Judge May noted that Atchison had undisputedly engaged in protected activity, and therefore, the relevant question was whether he had suffered from adverse action.  She concluded that Atchison was required to show that he had suffered a material change in his academic status.  With regard to the first issue, she concluded that the Board had not retaliated against him because its decision to not grant his request for readmission was not a serious or material change to his academic status.  As to the second, she concluded that the delay in its decision didn't affect Atchison's academic status, either, because he had already been expelled.  She rejected the third issue as time-barred because the holds were placed in 2008, and Atchison was or should have been aware of them at that time.

Moreover, Judge May concluded that Atchison hadn't shown a causal connection between his statutorily protected activity and the Board's denial of his

request for readmission or its alleged delay in denying his request. Atchison was required to show "but-for" causation, and he had not presented sufficient evidence to demonstrate an issue of fact as to causation.

Finally, as to coercion or intimidation, the fourth issue she considered, Judge May concluded that all of the conduct alleged by Atchison as coercion were time-barred, except for the response to his public records request. Here, Atchison had argued that the excessive cost of the public records request and the inclusion of the picture of the red stapler were meant coercively. Judge May applied the anti-interference provision of the Fair Housing Act and, therefore, determined that Atchison was required to demonstrate that the actions he complained of rose to a level higher than mere nuisance or mild interference, and he failed to do so. Ultimately, she granted the Board summary judgment on all issues.

Atchison timely appealed to us *pro se*. After the case was sent to oral argument, we appointed counsel to represent him on appeal. We thank counsel for her able service to Atchison and to the court.

## II. ANALYSIS

### A. Standard of Review

We review *de novo* a summary judgment determination, viewing all evidence in the light most favorable to the non-moving party. *Owen v. I.C. Sys., Inc.*, 629 F.3d 1263, 1270 (11th Cir. 2011). "Although we must draw all

14

*reasonable* inferences from the evidence in favor of" the non-moving party, we need not draw "unreasonable" inferences, like those supported only by the non-moving party's "speculat[ion]." *Brown v. Snow*, 440 F.3d 1259, 1266 (11th Cir. 2006) (emphasis added). The party moving for summary judgment bears the initial burden of establishing the absence of a dispute over a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party, who may not rest upon mere allegations, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Eberhardt v. Waters*, 901 F.2d 1578, 1580 (11th Cir. 1990).

## B. Anti-Retaliation Claim

Atchison alleges that the district court erred in granting the Board of Regents summary judgment on his claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973. Specifically, Atchison alleged that the Board, the university, and various individual defendants violated both Acts by unlawfully retaliating against him.[5]

---

[5] The Rehabilitation Act incorporates the same anti-retaliation provisions as the ADA. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). However, Atchison has waived this issue—that is, his anti-retaliation claims under the Rehabilitation Act—by failing to brief it. *Old West Annuity and Life Ins. Co. v. Apollo Group*, 605 F.3d 856, 860 n.1 (11th Cir. 2010); *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). We proceed by considering Atchison's anti-retaliation claims only as ADA violations, not as RA violations, though the outcome remains the same, because an RA analysis is identical. *See* 29 U.S.C. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990.").

The retaliation provision of the ADA reads, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge … under this chapter."  42 U.S.C. § 12203(a).

To establish a *prima facie* case for retaliation under the ADA, "a plaintiff must show that (1) [he] engaged in a statutorily protected expression; (2) [he] suffered an adverse . . . action; and (3) the adverse action was causally related to the protected expression."  *Shotz v. City of Plantation*, 344 F.3d 1161, 1180 (11th Cir. 2003) (quoting *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002)).[6]  Upon the establishment of all three elements, the burden then shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the challenged action."  *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001).  If the defendant does so, the burden shifts back to the plaintiff to demonstrate that the proffered reasons were merely pretextual.  *Id.* at 1243.

We understand Atchison's retaliation claims as alleging that he suffered retaliation from both Georgia Tech and the Board of Regents for the accommodations he received and those complaints about his accommodations.

---

[6] As we have explained before, "We assess ADA retaliation claims under the same framework we employ for retaliation claims under Title VII."  *Standard v. A.B.E.L. Servs.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (citation omitted).

16

The alleged retaliation, as we understand it, is that the university and Board both refused to readmit him.[7]  Both parties agree that the first prong of the ADA anti-retaliation test—that Atchison engaged in protected activity—is satisfied here. Accordingly, the only two issues on appeal are whether: (1) Atchison suffered an "adverse action"; and (2) if so, whether the adverse action was "causally related to the protected expression."  Because we conclude that Atchison did not suffer an "adverse action," as we explain below, we do not address the second issue of causal connection.

As the Supreme Court has explained, "The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of

---

[7] Atchison also alleges a broader retaliation—namely, that his entire misconduct record at Georgia Tech, including his expulsion, was the result of evidence manufactured against him by employees of the testing accommodations facility in response to his complaints about the conditions under which he took his tests.  Our review of the record has failed to unearth any evidence in support of this alleged conspiracy.  We find it significant that the determinations that Atchison violated school policies, along with the appeals of those decisions, were mostly rendered by students, presumably with no axe to grind against Atchison, which were then in turn upheld by the university's administration.  We do not think that it is a reasonable inference, based on the evidence before us, that a large number of students and high-level administrators conspired together to manufacture evidence against Atchison merely because he complained that testing proctors were talking loudly.  We think it far likelier that the determinations of Atchison's serious transgressions of school policy, the accuracy of which we do not seek to decide, were based on the substantial evidence presented in support of them.

17

discrimination.'" *Id.* at 68 (quoting *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).[8]  This inquiry is undertaken in the specific circumstances and context of the specific case.  *See id.* at 69.

Here, the "adverse action" that Atchison alleges is the Board's decision to deny his petition for readmission in October 2011.[9]  Atchison argues that the failure to readmit is the educational equivalent of the refusal to rehire, which we have previously held was an "adverse action."  *See Riccard v. Prudential Ins. Co.*,

---

[8] We reiterate that the correct standard is the one stated above, and does not require a serious and material change in the terms or conditions of employment.  As we have noted previously, *Burlington* abrogated the more stringent standard we previously required.  *See Crawford v. Carroll*, 529 F.3d 961, 974 n.14 (11th Cir. 2008).  To whatever degree the district court used the incorrect standard, the error is immaterial, as Atchison fails under *Burlington* as well.

[9] Atchison alleges that second "adverse action" was the Board's alleged 626-day delay in denying his petition for readmission.  Essentially, he argues that the Board was obligated to render a swift decision on his petition when he presented it to them on January 27, 2010—and that, by delaying 626 days in reaching a decision, and denying his petition in October 2011, he suffered an "adverse action."  We disagree.  As a practical matter, Atchison is picking a relatively arbitrary starting point for his measurements.  We count four separate times that Atchison requested reconsideration from the Board.  Atchison's 626-day calculation is derived from using the date of his *third* request as a starting point and the date of the Board's denial of his *fourth* request as an ending point.  There is little logic to this calculation.  As the Board explained in its timely denial of his third request, it would not reconsider its decision until George Peterson, the new president of Georgia Tech, had considered it himself.  Accordingly, Atchison submitted his petition to Peterson, who denied it.  Atchison then made his fourth request to the Board, which gratuitously agreed to consider it and placed it on its calendar.  Moreover, Atchison himself is responsible for at least part of the alleged "delay"—he requested an extension to better prepare.  It is inconceivable that an "adverse action" can arise from an action requested by an aggrieved party.  In any event, these infirmities notwithstanding, we do not believe that the delay alleged—regardless of how it is measured—could possibly "dissuade[] a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68 (quotation omitted).

18

307 F.3d 1277, 1292 (11th Cir. 2002) ("[T]he failure to reinstate is a discrete retaliatory act akin to a refusal to rehire.").

It may be true that a failure to readmit can be treated similarly to a failure to rehire, but Atchison misses the point. As our Court has made clear, a failure to rehire can only count as an adverse action when there is a "*new and discrete act* of discrimination in the refusal to rehire itself." *Burnam v. Amoco Container Co.*, 755 F.2d 893, 894 (11th Cir. 1985) (emphasis added). A continued refusal to rehire, on its own, "cannot resurrect the old discriminatory act." *Id.* Indeed, this requirement of showing a new discrete act of discrimination is quite sensible; "[o]therwise, a potential plaintiff could always circumvent the [statute of] limitations by reapplying for employment." *Id.* As the Board argues, they were under absolutely no obligation to readmit Atchison; moreover, they were not even obliged to re-review his application to begin with. Claiming that yet another request for reconsideration somehow resets the clock and counts as a new, discrete act would utterly eviscerate any statute of limitations. Atchison could keep filing requests for reconsideration year after year, and under his stance, the Board would be subject to suit from now until eternity. That cannot be. Because Plaintiff had already exhausted his appeals of right, and because he cannot point to any new, discrete act of discrimination against him, his retaliation claim must fail.

19

Not only does Atchison's claim fail because he cannot identify a discrete "action," he also has not established that the denial at issue was adverse. *Burlington* makes clear that for an action to be "adverse," it must be one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68 (quotation omitted). We have difficulty seeing how the Board's decision not to reconsider and overturn Atchison's five-year old expulsion would dissuade a reasonable person from making complaints about the accommodations that Atchison received five years ago. Even if we conceptualize Atchison's "protected activity" in this case as his continued requests for reconsideration of the university's expulsion decision, we similarly have difficulty seeing how the Board's decision not to reconsider and overturn the five-year old expulsion would dissuade a reasonable person from continuing to claim that the expulsion was retaliatory in the first place.

Here, Atchison lodged many requests for reconsideration and readmission with the university and with the Board of Regents—it is difficult to imagine that *this* denial, the last in a long series of denials, would dissuade a reasonable person in Atchison's position. Such a reasonable person might, quite logically, believe the Board's decision to gratuitously entertain Atchison's last request—which occurred after Georgia Tech's new president had an opportunity to consider Atchison's request—shows that it may well consider another request in the future. Moreover,

20

the Board's most recent denial of Atchison's request—coupled with the serious conduct which he was found guilty of after numerous hearings by presumably independent student committees—was entirely predictable.  In other words, under all the circumstances, no reasonable person could expect a decision different from the denial decision of the Board in October 2011, and therefore, no reasonable person could either consider the decision retaliatory or consider the decision materially adverse such that it would dissuade the exercise of his legitimate ADA rights.[10]

### C.  Anti-Interference Claim

The interference provision of the ADA provides that

[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this Act.

Atchison raised six different anti-interference claims under the ADA.  As the District Court understood them, these claims encompassed six different acts: (1) Defendants accused Atchison of violations he did not commit in 2000, 2004, and 2006; (2) suspended and expelled him in 2004 and 2006; (3) had him arrested

---

[10] Indeed, if Atchison really believed that he was the victim of a university-wide conspiracy to expel him, as he apparently does, it is difficult to imagine that *any* action, much less this one, would serve to dissuade him from continuing to litigate his claims.

for trespassing in 2009; (4) withheld his transcripts throughout 2008 and beyond; (5) cursed and laughed at him at a Board meeting in 2011; and (6) overcharged him for an open records request and included a picture of a red stapler in their response to his request in 2013.  The District Court dismissed the first five claims as time-barred and granted defendants summary judgment on the sixth.  Atchison contends that the district court erred in (1) finding that these claims were time-barred and in (2) granting the Board summary judgment on the sixth.  We do not address each individual claim, but we do address each alleged error in turn.

1.  Atchison's Time-Barred Claims

The statute of limitations for an ADA claim is determined by the statute of limitations for personal injury torts under state law.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  In this case, the applicable state statute of limitation— Georgia's—is two years.  O.C.G.A. § 9-3-33.  "Federal law determines when the statute of limitations begins to run," however, and "the statute of limitations does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with reasonably prudent regard for his rights." *Lovett v. Ray*, 327 F.3d 1181, 1182 (11th Cir. 2003) (quoting *Rozar v. Mullis*, 85 F.3d 556, 561 (11th Cir. 1996)).

In his *pro se* brief, Atchison argues that the claims weren't time-barred because they are "continuing violations," citing the Eighth Circuit's opinion in

*Kimzey v. Wal-Mart Stores*, 107 F.3d 568, 572–73 (8th Cir. 1997). He also argued that because Judge Batten determined that his claims were timely, the "law of the case" should've bound Judge May to that determination, and that Appellants manufactured evidence to defeat his claims and that they should've been sanctioned for doing so. In his supplemental brief, he argues that the statute of limitations ought to be tolled where, as here, the "tortious act is of a continuing nature and produces injury in varying degrees over a period of time." *See Everhart v. Rich's, Inc.*, 229 Ga. 798, 802 (Ga. 1972).

Of the five claims that the district court concluded were time-barred, we can summarily affirm on all but the alleged transcript holds. Each of those claims is clearly based on an event that took place well before the two-year period preceding August 30, 2013, when Atchison filed his complaint. As to the alleged transcript holds, however, Atchison's arguments have more merit.

Atchison essentially argues that the transcript holds are a "continuing" violation under Georgia law so as to toll the state statute of limitations. However, Atchison misstates the law in that regard. Georgia law is clear that the statute of limitations for a personal injury claim "begins to run at the time damage caused by a tortious act occurs." *Everhart*, 229 Ga. at 801. It is only when "there is a breach of a duty owed to another, e.g., the failure to warn of the existence of a hazard capable of producing injury, and exposure to the hazard or the cumulative effects

23

of continued exposure results in injury," which constitutes a "tort of continuing nature," that the statute of limitations is tolled "so long as the continued exposure to the hazard is occasioned by the continued failure of the tortfeasor to warn the victim[.]" *Id.* at 802. This is clearly inapplicable to the situation at hand.

Accordingly, Georgia's two-year statute of limitations for personal injury offenses applies, and the statute of limitations started running when "the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights." *Rozar*, 85 F.3d at 561–62 (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987)). Though it is true that some holds on Atchison's transcripts lasted until 2016, three years after he filed his complaint, it is undisputed that the holds at issue were placed on his account in 2008. Once the holds were imposed, and Atchison had knowledge thereof, he had all of the facts at that time to support a potential cause of action and the cause of action accrues. Atchison's argument to the contrary—that each *request* for a transcript denied by the school constitutes a new and discrete act—is wholly without merit. As soon as Atchison was aware that the transcripts were being held, he had all of the facts and need not wait for successive requests and denials before raising his cause of action.[11]

---

[11] We find it significant that, in his contemporaneous emails to John Stein regarding the holds on his transcripts, Atchison *clearly* conceptualized, rightly or wrongly, what was happening as a violation of his rights. On May 22, 2008, he emailed Stein and said, "Please remember that I

24

Even if Atchison somehow wants to argue he was not put on notice at the outset, the only holds that carried into the statute of limitations period were holds due to a Perkins loan being overdue.  The holds put in place by Student Services, related to his expulsion, were all permanently lifted at latest by 2010.  Whatever qualm Atchison may have with the holds put in place by Student Services, these holds are irrelevant because they clearly lapsed before the limitations period.

All told, the mere fact that the effects of the holds continue is of no moment. The Supreme Court has noted that it has rejected the "continuing violation theory" in this context because "[t]he proper focus is upon the time of the *discriminatory acts*, not upon the time at which the *consequences* of the acts becomes most painful.'"  *Lorance v. AT&T Techs.*, 490 U.S. 900, 906–10 (1989).

---

have spent $130,000 in tuition at GT.  I feel I have a right to view and order my transcript whenever I want, regardless of sanctions."  The next day, he followed up with Stein and said, "My right to view and order copies of [my transcript] cannot be interfered with. . . . [T]he registrar disregarded the rules and process stipulated by the GIT handbook, and unilaterally abrogated Mr. Atchison's right as a student to have his petition heard by the proper committee." At one point, in response to an email on which Hyen-Yeng Sung, a Georgia Tech lawyer, had been CCed and rhetorically asked, "Can you please explain why an attorney is involved? Do I need to retain an attorney also?"  Several months later, he had retained Alan Manheim as counsel.  Manheim sent an email to Gary Wolovick and John Stein on July 31, 2008, informing them that the hold on Atchison's account needed to be lifted.

In other words, Atchison was clearly aware of facts that could have given rise to a claim. Not only was he *objectively* aware based on the attendant facts and circumstances, but his conduct and words make clear that he was *subjectively* aware—he characterized the holds as violating his rights, asked if he needed to hire a lawyer, and ultimately did so.  Accordingly, the statute of limitations began running at this point.

25

Accordingly, we affirm as to this issue.  The district court properly determined that the first five anti-interference claims raised by Atchison were barred by the applicable statute of limitations.

2.  Atchison's Open Records Request

The district court granted the Board of Trustees summary judgment on Atchison's final anti-interference claim—that the Board, by allegedly overcharingg him for his Open Records request, and by including a red stapler in a picture of responsive documents, illegally interfered with him.  Atchison alleges that this was in error.

We begin by noting that we have not yet had occasion to explain the proper standard for evaluating an ADA anti-interference claim.  The district court interpreted the ADA's anti-interference provisions *in pari materia* with the Fair Housing Act's anti-interferences as crystallized in 42 U.S.C. § 3617 (providing that it is "unlawful to coerce, intimidate, threaten, or interfere with any person" because of "any right granted or protected" under the law).  The District Court concluded that the FHA was the proper analog because "the FHA's provision is the exact same as the ADA's provision" and because it had the "same broad Congressional intent."  Then, citing several district court cases from within the Eleventh Circuit, the District Court concluded that the claimant must show "discriminatory conduct that is so severe or pervasive that it will have the effect of

26

causing a protected person to abandon the exercise of his" rights, *Lawrence v. Courtyards at Deerwoods Ass'n*, 318 F. Supp. 2d 1133, 1144 (S.D. Fla. 2004), and that "the discriminatory conduct [was] pervasive and severe enough to be considered as threatening or violent." *Id.* (citing *Delwater-Gourlay v. Forest Lakes Estates Civil Ass'n of Port Richey, Inc.*, 276 F. Supp. 2d 1222, 1235 (M.D. Fla. 2003) (vacated on other grounds)).  Because the District Court concluded that Atchison had not made such a showing, it granted defendants summary judgment.

Atchison argues that this was in error and suggests that we look to anti-interference tests from the Seventh and Ninth Circuits, citing their opinions in *Frakes v. Peoria Sch. Dist. No. 150* and *Walker v. City of Lakewood*, respectively. In *Frakes*, the Seventh Circuit held that "a plaintiff alleging an ADA interference claim must demonstrate that: (1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate." *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017).  Meanwhile, in *Walker*, the Ninth Circuit defined "interference" under the FHA as "the act of meddling in or hampering an activity or process." 272 F.3d 1114, 1128–29 (9th Cir. 2001) (citing Webster's Third New Int'l Dic. 1178 (14th ed. 1961)).

The Board, meanwhile, urges us to look to the FHA's anti-interference provisions as persuasive authority in crafting a test for ADA anti-interference claims. It argues that we should adopt a test with three constituent elements: (1) that the plaintiff exercised a protected right; (2) a defendant interfered with, or coerced, intimidated, or threatened the plaintiff on account of his exercise of that right; and (3) the defendant did so because of discriminatory animus. This test is loosely derived from our holding in *Sofarelli v. Pinellas Cnty.*, 931 F.2d 718, 721–23 (11th Cir. 1991), along with how our district courts have interpreted *Sofarelli*.

We need not determine the proper standard, because Atchison's claims fail under any potentially feasible standard; we conclude that both of his remaining claims fail as a matter of law for lack of any factual support. Accordingly, we affirm the district court's decision, but for a different reason than it elucidated. *See Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 980 (11th Cir. 2016) (citation omitted) ("[W]e may affirm for any reason supported by the record, regardless of whether the district court relied on it.").

First, Atchison argues that when the Board charged him $1,229.63 for his Open Records request, the Board was illegally interfering with him. We are unpersuaded. Georgia law allows agencies to "impose a reasonable charge for the search, retrieval, redaction, and production or copying costs for the production of records." O.C.G.A. § 50-18-71(c)(1). The Board, therefore, is entitled to charge

for Open Records requests.  The explanation provided by the Board—that Atchison requested records that were only available in paper form, required redaction, and so on—is plausible.  Atchison presents no proof that he was actually overcharged.   Atchison claims that because the number of documents he requested was low, the cost to produce them must also have been low.  But he does nothing to rebut the Board's proffered explanation: that the reproduction costs were linked to review and redaction expenses pursuant to the Family Educational Rights and Privacy Act.  He similarly presents no proof that any such overcharge, even if it occurred, was borne out of illegal interference.

Second, Atchison alleges that the inclusion of a red stapler in the picture of the records he requested constitutes further interference with him.  His argument, as we understand it, is that, by including a red stapler in the picture, the Board was making a reference to the 1999 film *Office Space*, and was indirectly calling him mentally disabled.  A subplot of the film features a meek office worker whose prized red stapler is taken from him by his boss and his repeated efforts to have it returned to him.  Atchison argues that the character in question was mentally disabled and that the Board was comparing him to the character vis-à-vis the red stapler.  While including the stapler in the photo was perhaps insensitive, no reasonable jury would say that mocking Atchison rises to the level of interfering with his rights.   His feelings may have been hurt, but that does not constitute

29

interference, even under the standard he proposes. *See Walker*, 272 F.3d at 1128–29.

Accordingly, we affirm the district court's decision granting the Board summary judgment on Atchison's anti-interference claims. Our review of the claims persuades us that they are both without merit.

### III. CONCLUSION

In conclusion, we affirm the district court's decision granting the Board of Regents summary judgment as to Lewis Atchison's anti-retaliation and anti-interference claims under the Americans with Disabilities Act and the Rehabilitation Act of 1973. With regard to Atchison's anti-retaliation claim, we conclude that he failed to demonstrate that he suffered an "adverse action." And with regard to his anti-interference claim, we agree with the district court that the vast majority of his claims are time-barred and that the final claim fails as a matter of law.[12]

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**[13]

---

[12] We note that Atchison purports to raise several other issues in his initial brief, including a Due Process claim based on the denial of his request for readmission; an Equal Protection claim; and claims under the First Amendment, 42 U.S.C. § 1983, and the Georgia Constitution. To the extent that Atchison has properly preserved and raised these issues, we conclude that they are wholly without merit.

[13] Appellant's motion to strike is **DENIED.**